**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MARIA R. LOPEZ,          ) | |
|          ) | |
|       Plaintiff,       ) | |
|          ) | **No. 12 C 7025** |
| **v.**          ) | |
|          ) | **Magistrate Judge Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting**    ) | |
| **Commissioner of Social Security,**[1]   ) | |
|          ) | |
|       Defendant.    ) | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Claimant Maria Lopez ("Lopez" or "claimant") filed this action seeking review of the final decision of the Commissioner of Social Security (the "Commissioner"), denying Lopez's claim for disability insurance benefits ("DIB") under the Social Security Act ("the Act"), 42 U.S.C. §§ 416(i) and 423(d). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Lopez and the Commissioner have each filed a cross-motion for summary judgment [21, 26]. For the reasons set forth below, Lopez's motion for summary judgment [26] is granted in part and denied in part, the Commissioner's motion for summary judgment [21] is denied, and the case is remanded for further proceedings consistent with this Opinion.

## I. BACKGROUND

### A. Procedural History

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Commissioner Michael J. Astrue as defendant in this suit.

Lopez applied for DIB on August 26, 2009, alleging that she became disabled on March 6, 2009 due to chronic hepatitis, type II diabetes, high blood pressure and esophageal problems.  (R. 66.)  After filing her initial application, she began seeking treatment for depression and this was added to her claim for DIB.  (R. 31.)  Her application was denied on November 17, 2009, and upon reconsideration on April 14, 2010.  (R. 67, 72.)  Lopez requested a hearing on May 26, 2010, which was held before Administrative Law Judge Janice Bruning (the "ALJ") on April 6, 2011.  (R. 39-60.) Lopez and a Vocational Expert testified at the hearing.  (*Id.*)  On June 7, 2011, the ALJ denied Lopez's request for DIB.  (R. 23-32.)  Lopez then sought review of the ALJ's decision, but the Appeals Council denied review on July 6, 2012.  (R. 1.)  She now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.  *Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009).

**B.  Medical Evidence**

**1.  Dr. Archana Goel**

Lopez began seeing her primary care physician, Dr. Archana Goel, on April 19, 1999.  (R. 332.)  Since that date, she has seen Dr. Goel approximately five times per year.  (*Id.*)  Dr. Goel diagnosed Lopez with autoimmune hepatitis, cirrhosis of the liver, type II diabetes, esophageal varices, osteoporosis, hypertension, and autoimmune thrombocytopenia.  (*Id.*)  While many of Dr. Goel's treatment notes are illegible, it is clear that Lopez saw Dr. Goel regularly for her diabetes.  (R. 265-69, 314-18.)  These treatment notes indicate that at times, Lopez stated that she was not watching her diet, and she was not taking all of her prescribed medication.  (R. 266.)  These notes also

2

reveal that Lopez occasionally reported having low energy and fatigue. (R. 265, 314-15.)

On January 13, 2010, Dr. Goel completed a Physical Residual Functional Capacity Questionnaire, in which she stated that Lopez's prognosis was fair, and her symptoms included chronic fatigue and bruising easily. (R. 332.) According to the questionnaire, Lopez was not experiencing any pain. (*Id.*) Dr. Goel also indicated that Lopez's medication caused fatigue, but that her pain and other symptoms were only rarely severe enough to interfere with the attention and concentration necessary to perform simple tasks. (R. 333.) Dr. Goel also stated that Lopez can only walk two blocks without resting, she can sit for more than two hours at a time, and she can stand for one hour at a time. (*Id.*) Dr. Goal also opined that in an eight hour workday, Lopez can sit for four hours, stand or walk for less than two hours, and she would need to take unscheduled, fifteen-minute breaks every ninety minutes. (R. 332-34.) Dr. Goal concluded that Lopez would likely have "good days" and "bad days" and she would be absent from work more than four days per month. (R. 334.)

### 2.  Dr. Deepak Khurana

Lopez was also treated by Dr. Deepak Khurana, a gastroenterologist. On March 7, 2009, Dr. Khurana performed an ultrasound of Lopez's liver, which revealed cirrhosis of the liver with no ascites present. (R. 234.) Dr. Khurana noted that there was evidence of gallstones, possible kidney stones, and bidirectional flow in the main portal vein, and these findings were consistent with records from July of 2008. (*Id.*) At an appointment later that month, Lopez stated she was doing well, she suffered from no

cardiac, respiratory, or gastrointestinal issues and her abdomen appeared normal.  (R. 242.)

On April 7, 2009, Dr. Khurana performed an esophagastroduodenoscopy (an "EGD"), which indicated mild gastritis with no varices.  (R. 239-40.)  Her stomach was normal and the esophagus showed some scarring from a previous rubber band ligation.  (R. 239.)  The test also showed some small superficial venules and a small sliding hiatal hernia.  (*Id.*)  At this time, Dr. Khurana noted that Lopez complained of mild systemic disease with no functional limitations.  (R. 326.)  Dr. Khurana recommended that Lopez continue with the beta blockers and undergo another EGD in one year.  (R. 239.)  In a follow up visit on July 8, 2009, Dr. Khurana noted that Lopez was suffering from heartburn and hypertension, but her abdomen was normal and there were no other gastrointestinal issues.  (R. 241.)

Dr. Khurana examined Lopez again on June 15, 2010.  (R. 371.)  At that time, Lopez complained of some on and off fatigue, bloating and heartburn.  (*Id.*)  Dr. Khurana indicated there was no recent weight change and no other cardiovascular, genitourinary, or musculoskeletal issues.  (*Id.*)  Her vitals were normal and her general appearance was "well nourished" and "well developed."  (R. 372.)   Dr. Khurana's assessment was esophageal disorders, esophageal varices, chronic active autoimmune hepatitis, and primary biliary cirrhosis.  (*Id.*)  She prescribed Prednizone, Propranolol, Ursodiol and Ranitidine and recommended a follow-up visit in a few months.  (R. 373.)

Dr. Khurana performed a second EGD on July 12, 2010, which showed mild esophagitis and a small hiatal hernia.  (R. 350.)  At this time, Dr. Khurana noted again a small sliding hiatal hernia, some erythema at the GE junction, mild gastritis and a small

benign nodule in her stomach. (R. 350-51.) Otherwise, there were no varices or abnormalities in the stomach or esophagus. (*Id.*) A subsequent biopsy of the stomach nodule showed gastric mucosa with mild to moderate chronic inflammation, and the GU junction biopsy revealed gastroesophageal junction mucosa with moderate acute and chronic inflamation. (R. 352.)

On November 9, 2010, Dr. Khurana examined Lopez prior to a trip she was taking to Puerto Rico. (R. 368.) Dr. Khurana noted no malaise, no fever and no recent weight change. (*Id.*) She indicated that there were no cardiovascular, gastrointestinal, genitourinary, or musculoskeletal issues. *(Id.)* At the time, Lopez was taking the following medications: Boniva, calcium tablets, Lantus, Lininopril, Prednizone, Ranitidine, and potassium tablets. (*Id.*) Her vitals were normal and her general appearance was "well developed" and "well nourished." (R. 369.) Dr. Khurana's assessment was esophageal varices, PBC/AIH overlap syndrome, and autoimmune hepatitis. (*Id.*) On November 19, 2010, Dr. Khurana performed an ultrasound of Lopez's abdomen, which revealed that her gallbladder had an abnormal appearance and the wall was thickened, and there was a gallstone present. (R. 345.)

There is no evidence of any mood disorders, depression or anxiety in any of Dr. Khurana's treatment notes. Nevertheless, Dr. Khurana completed a mental impairment questionnaire for Lopez on November 22, 2010, noting that, in addition to her physical impairments, Lopez suffered from major depression. (R. 340.) Dr. Khurana assigned Lopez a GAF score of 50. (*Id.*) Dr. Khurana stated that, as a result of her depression, Lopez suffered from poor memory, appetite disturbance with weight change, sleep disturbance, mood disturbance, anhedonia or pervasive loss of interests, feelings of

guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or isolation, decreased energy, persistent irrational fears and generalized persistent anxiety. (*Id.*) Dr. Khurana did not indicate that Lopez's depression caused delusions or hallucinations but found her mood to be sad and anxious, and that she had low concentration. (R. 340-41.) She also noted that Lopez was taking Lexapro for her depression, which may affect her ability to work because it caused fatigue. (R. 341.) She stated that Lopez's impairment lasted or could be expected to last longer than twelve months, and that the depression would cause Lopez to be absent from work more than three times a month. (*Id.*)

Additionally, Dr. Khurana indicated that Lopez has a "poor" ability to perform the following tasks: maintain attention for two-hour segments, maintain regular attendance and be punctual, work in coordination or proximity to others without distraction, complete a normal workday or workweek without interruptions from her mental impairment, perform at a consistent pace without taking a number of breaks, respond appropriately to changes in her routine work setting, and deal with normal stress. (R. 342.) Dr. Khurana attributed these impairments to Lopez's depression, low concentration, anxiety, and poor stress tolerance. (R. 343.) Dr. Khurana opined that Lopez's capabilities are "good" with respect to the following work tasks: remembering work-like procedures, understanding, remembering and carrying out very short and simple instructions, sustaining an ordinary routine without special supervision, making simple work-related decisions, asking simple questions or requesting assistance, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers, and taking appropriate precautions around normal

6

hazards.  (R. 342.)

Dr. Khurana indicated the extent to which these functional areas are affected by Lopez's mental impairments.  (R. 343.)  Dr. Khurana found that Lopez's depression only "slightly" restricts her daily activities, its effect on her social functioning is "marked," and its effect on her concentration, persistence, or pace is "frequent."  (*Id.*)  In addition, Dr. Khurana opined that Lopez's depression would lead to repeated episodes of decompensation in a work-like setting that would cause her to withdraw or experience exacerbated signs and symptoms.  (R. 342.)

### 3. Dr. Eva Kurilo

Psychologist Dr. Eva Kurilo treated Lopez for depression beginning on February 28, 2010.  (R. 363.)  Dr. Kurilo diagnosed Lopez with major depression, single episode, and assigned her a GAF score of 60.  (R. 364.)  At this appointment, Lopez's mood was sad, her affect mood congruent, and she was tearful on a few occasions but smiling appropriately during the interview.  (*Id.*)  Dr. Kurilo also noted that Lopez's attention was good and her concentration and insight were fair.  (*Id.*)  Dr. Kurilo reported that Lopez denied any history of voices, visions or paranoia.  (R. 363.)  Lopez stated that she had been having problems with depression for the last few years, but her depression has become more problematic recently because she is having issues with her husband, who wants to return Puerto Rico, and she would like to stay here.  (*Id.*)  She was not previously treated for depression.  (*Id.*)  Lopez stated that her symptoms include: crying spells, anxiety, concentration problems, lack of energy, sleeping too much, and periods of helplessness and hopelessness.  (*Id.*)  Dr. Kurilo wanted to begin Lopez's treatment with psychotherapy rather than medication because she was already taking so much

medication for her other medical issues. (R. 365.) However, Lopez felt strongly that she needed to begin anti-depressant medication, so Dr. Kurilo prescribed a very small dose of Celexa. (*Id.*)

On March 13, 2010, Dr. Kurilo noted that Lopez was "doing better." (R. 357.) She modified Lopez's medication by prescribing Lexipro. (*Id.*) Lopez reported major improvement, no side effects, adequate and uninterrupted sleep, and clear thought processes. (*Id.*) On May 26, 2010, Dr. Kurilo again opined that Lopez was "doing well" and had been benefitting from the medication with no side effects. (*Id.*) She also noted her mood was "good" and she continued to have adequate and uninterrupted sleep and clear thought processes. (*Id.*)

On September 7, 2010, Dr. Kurilo described Lopez as "doing fairly well" despite reporting some anxiety and feeling easily overwhelmed. (R. 359.) Lopez did not report any side effects from the Lexipro and she did not want to increase her dosage. (*Id.*) Dr. Kurilo noted that Lopez's mood was depressed and anxious. (*Id.*) She also noted that Lopez had applied for social security benefits. (*Id.*)

On November 21, 2010, Dr. Kurilo stated that Lopez was "doing fair," and had been feeling more depressed and anxious. (R. 360.) Lopez reported that she was not sleeping well, and that she had experienced problems concentrating. *(Id.)* Dr. Kurilo also stated that Lopez was "not able to hold down any type of job on a full time basis." (*Id.*) Dr. Kurilo noted that there were no side effects from the medication and she increased the dosage of Lexapro by five milligrams. (*Id.*)

### 4. Dr. James Madison

8

Dr. James Madison, a state agency physician, completed a Residual Physical Functional Capacity Assessment on November 16, 2009. (R. 283-90.) Dr. Madison noted Lopez's history of chronic hepatitis and cirrhosis of the liver, a previous episode of esophageal varices (where no transfusion was necessary), and the results of her 2009 EGD scope showing a lack of varices. (R. 284.) He also indicated that her liver function tests have been "low but not listing level," and that she complained of fatigue. (*Id.*) Dr. Madison opined that Lopez could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk with normal breaks for about six hours in an eight-hour period, sit for a total of six hours, and that her ability to push and pull foot or hand controls is unlimited. (*Id.*) He opined that she would occasionally be limited in her ability to climb ramps, stairs, or ladders, as well as balance. (R. 285.) Dr. Madison reported no manipulative, visual, communicative, or environmental limitations. (R. 286-87.) Ultimately, he concluded that Lopez's physical impairments do not cause any significant limitations to her daily functioning. (R. 290.) Dr. Madison did not evaluate Lopez's mental impairments because at the time of this assessment, she was not yet receiving medical treatment for her depression.

### B. Claimant's Testimony

Lopez testified at her hearing before the ALJ that she is married with adult children and that she lives with her husband and her son. (R. 40.) She has a ninth grade education and speaks English as a second language. (R. 41.) She testified that her son often assists her when she has difficulty understanding English. (R. 42.) She does not have a driver's license and she has not received any specialized vocational training. (*Id.*) In addition, she does not currently receive assistance from the state, nor

is she currently receiving unemployment. (*Id.*) She has not worked since March 6, 2009. (R. 43.)

Prior to March 6, 2009, Lopez worked as a coiler for the Gibson Guitar company, making strings for guitars. (*Id.*) Lopez had worked at the Gibson factory for approximately 23 years before it closed in March of 2009. (*Id.*) As a coiler, her job required her to sit down most of the time and did not require her to lift things frequently. (*Id.*) However, her job required constant movement back and forth while sitting. (R. 53.) She had received approximately three or four months of training for this job. (R. 44.) She stopped working at Gibson because it closed. (*Id.*)

Lopez testified that several years prior to 2009 she developed a liver problem and she experienced some difficulty at work. (R. 51.) As a result of her health impairments, she would become tired and dizzy, and her chest would start to beat faster, forcing her to stop her work and take unscheduled breaks. (R. 51, 53.) She testified that she would take approximately three breaks a day in addition to the regularly scheduled breaks and lunch period. (R. 53.) Although her supervisors knew that she needed to take frequent breaks and did not discipline her for this, they spoke to her on a number of occasions about reducing the number of breaks that she took during the work day. (R. 54.) Lopez also testified that she would leave early to go home approximately six to eight times per month and would have to stay home from work approximately four to five times per month. (R. 52.)

Lopez stated that she is currently going to the doctor for check ups and blood testing for her liver condition. (R. 44.) She stated that the medication she takes for her liver condition causes certain side effects, including depression, and that she has to

control her diabetes with insulin because her liver medication prevents her from taking pills.  (R. 45.)  She reported that she is easily fatigued by physical exertion, such as walking or climbing stairs.  (R. 45-46.)  She can walk approximately one block without resting, can stand for a half hour before needing to sit again, and can sit still for one hour.  (R. 46.)  Lopez also stated that she does not sleep well at night and she sleeps during the day for two hours as often as twice a week.  (R. 47-48.)  She is able to lift a gallon of milk and she does not use a cane or other assistive devise.  (R. 47.)  She has difficultly reaching overhead, kneeling and using her hands.  (*Id.*)

Lopez testified that she is able to do personal tasks on her own, such as dressing herself, but that she is unable to perform household duties, such as cooking, shopping and dishes without her husband.  (R. 48-49.)  Lopez testified that she regularly attends church, she does not read newspapers or books because she easily forgets what she has read and she no longer partakes in activities that she once enjoyed doing, such as cooking, baking and sewing.  (R. 49-50.)  She also does not use a computer at home, but she does watch television for about two hours at a time.  (R. 49.)  It is not unusual for her to leave the house only one day a week.  (R. 51.)

Lopez also stated that her depression affects her moods.  (R. 55.)  She feels nervous, as though something is about to happen to her.  (*Id.*)  At times, she also feels like someone is following her when she leaves her house.  (*Id.*)  These symptoms began about three years ago.  (*Id.*)

### C.  Vocational Expert's Testimony

The Vocational Expert ("VE"), Cheryl Hoiseth, testified that Lopez's most recent job as a coiler, which she performed by hand, could not be found in the Dictionary of

11

Occupational Titles. (R. 57.) It bears a close resemblance to the job of a musical instrument assembler, which is characterized as light and semi-skilled, and which carries an SVP rating of 3. (*Id.*) Because Lopez testified that her job required her to lift ten lbs frequently, as well as receive three to four months of training, the VE characterized the job of a coiler as requiring "light exertion" and increased its SVP rating to 4. (*Id.*)

The ALJ asked the VE to consider whether an individual with claimant's same age, education and work experience would be capable of performing light work, excluding climbing ladders, ropes or scaffolding. (*Id.*) The VE testified that such an individual would be able to perform the claimant's past relevant work. (*Id.*) She also testified that the same would be true if the individual needed to avoid concentrated exposure to work hazards such as heights and moving machinery. (R. 58.) When asked what would happen if such an individual would miss one and a half days a month, the VE testified that this would be preclusive of any job. (*Id.*) Further, as employees in manufacturing positions cannot be off task for more than ten percent of the time, there would be little tolerance for an employee who needed to take additional breaks on top of those typically allowed. (R. 60.)

## II. LEGAL ANALYSIS

### A. Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*citing Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (*quoting Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," she "must build an accurate and logical bridge from the evidence to [her] conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate her assessment of the evidence to assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

## B. Analysis Under the Social Security Act

Whether a claimant qualifies for DIB depends on whether the claimant is "disabled" under the Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant

13

is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether [he] can perform [his] past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ followed this five-step process here. At step one, the ALJ found that Lopez has not engaged in substantial gainful activity since March 6, 2009, the alleged onset date. At step two, the ALJ found that Lopez's history of cirrhosis of the liver/hepatic disease and osteopenia are severe impairments. At step three, the ALJ determined that Lopez does not have an impairment or combination of impairments that meets or equals the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526.

The ALJ then assessed Lopez's residual functional capacity ("RFC") and found that the claimant has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), except that she should avoid working around dangerous machinery. Ultimately, the ALJ held that Lopez is capable of performing past relevant work as an assembler in a factory. Therefore, the ALJ found that Lopez was not entitled to DIB.

Lopez now argues that the ALJ's decision was erroneous for a number of reasons. First, she argues that the ALJ erred at step four when she determined that

14

Lopez's mental residual functional capacity was not significantly limited by her depression and other mental impairments. Next, she argues that the ALJ improperly ignored favorable medical evidence and failed to give proper weight to the opinions of her treating physician. Finally, Lopez argues that the ALJ's credibility assessment was improper. We address each of these arguments in turn below.

### 1. The ALJ Did Not "Cherry-Pick" The Medical Evidence Regarding Lopez's Depression.

Lopez first argues that in making her RFC determination, the ALJ did not properly consider the medical evidence regarding her depression. She argues that the ALJ "cherry picked" evidence in finding that the record does not support Lopez's complaints of being paranoid and severely depressed. She asserts that the medical records of both Dr. Kurilo and Dr. Khurana support a finding that she suffered from debilitating depression, and that the ALJ only focused on those statements in the record that Lopez was "doing well," while ignoring the statements in the medical records that demonstrate her depression and paranoia.

An ALJ must determine a claimant's RFC based on the evidence in the record. *See* C.F.R. § 404.1546(c) (2011); *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). An ALJ is obligated to consider all relevant medical evidence and may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding. *Goble v. Astrue*, 385 F. App'x. 588, 593 (7th Cir. 2010). However, an ALJ need not mention every piece of evidence so long as she builds a logical bridge from the evidence to her conclusion. *Id.* The court will defer to the ALJ's factual determinations

if they are supported by substantial evidence. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (*citing* 42 U.S.C. § 405(g)).

We disagree with Lopez's argument that the ALJ only focused on those statements in the record that support a decision to deny Lopez's claim. The ALJ did discuss the mental impairment questionnaire prepared by Dr. Khurana, in which she stated that Lopez suffered from depression. The ALJ explained, however, that there is nothing in Dr. Khurana's treatment notes to support these findings. The ALJ also adequately explained that she chose not to afford significant weight to this questionnaire because Dr. Khurana was Lopez's gastroenterologist, and not her psychiatrist.

The ALJ also discussed the medical evidence submitted by Dr. Kurilo and noted that these treatment notes reveal some occurrences of depression and anxiety. However, as the ALJ also explained, Dr. Kurilo noted that Lopez never experienced any "voices, visions or paranoia," and prescribed only a small dosage of anti-depressant medication, which Lopez tolerated well with no side effects. The ALJ did state that Lopez complained of depression and anxiety, but that Dr. Kurilo's notes generally characterized Lopez's progress in positive terms. Because we find that the ALJ did reference some of the evidence that could support a finding of disability, Lopez's "cherry-picking" argument is without merit.

### 2. The ALJ Failed to Apply the Required "Special Technique" for Mental Impairments

Next, Lopez argues that the ALJ did not properly analyze the impact of her depression. In cases where a claimant presents evidence that he or she suffers from a mental impairment such as depression, the ALJ must apply a special technique to

determine whether a claimant has a medically determinable mental impairment and whether that impairment causes functional limitations. *Craft*, 539 F.3d at 674. The special technique is usually applied at step two of the five step analysis. *Id.* Under the special technique, the ALJ evaluates the claimant's pertinent symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable mental impairment. *Gillim v. Colvin*, 11 C 7146, 2013 WL 1901630, at *3 (N.D. Ill. May 7, 2013). The ALJ's decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). 20 C.F.R. § 404.1520a(e)(4); *see Craft*, 539 F.3d at 675. If the claimant has a medically determinable mental impairment, the ALJ must document her specific finding as to the degree of functional limitation in four broad areas: daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). These functional areas are known as the "B Criteria." *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00 et seq.

The first three areas of the B Criteria are rated on a five-point scale of none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). The final functional area is rated on a four-point scale of none, one or two, three, and four or more. *Id.* "If the ALJ rates the first three functional areas as none or mild and the fourth area as none, then generally the impairment is not considered severe." *Gillim,* 2013 WL 1901630, at *3 (*citing Craft*, 539 F.3d at 674-75.) "Otherwise, the impairment is considered severe, and the ALJ must determine whether it meets or is equivalent in severity to a listed mental disorder." *Id.* If the impairment neither meets nor is

equivalent in severity to any listing, then the ALJ will assess the claimant's RFC. *Id.* "The decision must include a '*specific finding*' as to the degree of limitation in each of the functional areas." *Id.* (*citing Craft*, 539 F.3d at 675) (emphasis added).

In this case, the ALJ determined at step two that Lopez's depression was not a severe impairment. The ALJ did not apply the special technique when evaluating Lopez's depression at this stage; the ALJ simply found that Lopez's depression was not severe with no discussion at all of the B Criteria. The ALJ did consider three of the four "B Criteria" later in her RFC analysis. At that step, she concluded that Lopez had "only mild restriction in her activities of daily living, social functioning, and concentration, persistence, and pace." (R. 31.) The ALJ made no specific finding as to the fourth criteria, episodes of decompensation.

An ALJ's failure to fully comply with the special technique may be harmless, so long as substantial evidence supports the ALJ's conclusion at step two that Lopez's mental impairment was not severe. *See Pepper v. Colvin*, 712 F.3d 351, 366 (7th Cir. 2013); *Craft*, 539 F.3d at 675. However, the ALJ's failure is not harmless where the ALJ's ratings for the B Criteria were made without any "expert foundation." *Gillem*, 2013 WL 1901630, at *4 ("In the absence of any 'expert foundation' for these ratings, [the Court] could not 'discern the necessary logical bridge from the evidence of the ALJ's conclusions.'"). In other words, an ALJ cannot simply rely on her own unsupported judgments to determine whether or not a claimant's mental impairments are severe. *Id.* An ALJ "may not draw conclusions based on an undeveloped record and 'has a duty to solicit additional information to flesh out an opinion for which the medical support is not

readily discernible.'" *Richards v. Astrue*, 370 F. App'x 727, 731 (7th Cir. 2010) (*quoting Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004)).

Here, the mental impairment questionnaire that Dr. Khurana filled out did address the four B Criteria, but the ALJ disregarded this questionnaire for the reasons stated above. The only other evidence in the record regarding Lopez's depression was Dr. Kurilo's treatment notes, which do not include any findings regarding the B Criteria. Therefore, without any expert foundation as to these criteria, the ALJ had a duty to solicit additional information. The ALJ's failure to do so here requires remand. *See Richards*, 370 F. App'x at 731 (holding that in the absence of expert foundation for the B Criteria ratings, the court cannot discern a logical bridge from the evidence to the ALJ's conclusions); *Gillim*, 2013 WL 1901630, at *5 (holding that remand was necessary when the ALJ relied solely on her own interpretation of the medical evidence and made conclusions that had no expert support in the record). On remand, the ALJ should properly apply the special technique at step two of her analysis.

### 3. The ALJ Afforded Proper Weight to the Medical Opinion Evidence.

Although we have already determined that remand is warranted, we will briefly address the other issues raised in Lopez's motion. Next, she argues that the ALJ erred in failing to give controlling weight to Dr. Khurana's diagnosis of depression. Generally, an ALJ gives the opinion of a treating physician controlling weight because they are "most able to provide a detailed, longitudinal picture" of the claimant's medical condition. 20 C.F.R. § 404.1527(d)(2); *Clifford*, 227 F.3d at 870 ("more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances") (internal citations omitted). However, a treating

physician's opinion is only entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2); *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006). While different medical opinions must be considered in evaluating a claimant's medical impairments, "the final responsibility for deciding the issues is reserved to the Commissioner." 20 C.F.R. § 404.1527(d)(2). The ALJ is free to discount the opinion of the treating physician so long as he provides good reasons for doing so. *Clifford*, 227 F.3d at 870.

In addition, "[t]he weight properly to be given to testimony or other evidence of a treating physician depends on circumstances." *Hofslien,* 439 F.3d at 377. Among the factors that the ALJ should consider in order to determine the weight of the treating physician's opinion is the nature and extent of the treatment relationship (20 C.F.R. § 404.1527(c)(2)(ii)), and the specialization of the physician providing the opinion (20 C.F.R. § 404.1527(c)(5)). Generally, the ALJ will give more weight to the opinion of a physician when those opinions relate to a medical issue in his or her area of specialty, as well as opinions relating to medical issues for which the physician has specifically treated the patient. *See generally* C.F.R. § 404.1527(c). The ALJ does not need to accept an expert witness's opinion that is outside her field of expertise. *Schmidt v. Apfel*, 201 F.3d 970, 973 (7th Cir. 2000).

Lopez argues that the ALJ should have given controlling weight to Dr. Khurana's mental impairment questionnaire. We disagree. The ALJ adequately explained that she was not giving this report controlling weight because Dr. Khurana specializes in gastroenterology, not mental health, and had not treated Lopez for her mental health

issues. In addition, the mental health questionnaire is inconsistent with Dr. Khurana's other medical notes, in which there was no mention of any complaints of depression, paranoia or anxiety. (*See, e.g.*, R. 302-04.) As the ALJ noted, it was unusual that after treating Lopez for two years for her cirrhosis (and notably, after Lopez's initial request for DIB was denied), Dr. Khurana submitted the questionnaire regarding Lopez's mental health. Accordingly, we find that the ALJ was entitled to give less weight to the opinions of Dr. Khurana regarding her depression.

### 4. The ALJ Did Not Properly Evaluate The Claimant's Credibility.

Lopez also argues that the ALJ erred in finding that Lopez's testimony regarding her limitations was not credible. The ALJ is in the best position to determine the credibility of witnesses, and this Court reviews that determination deferentially. *Craft*, 539 F.3d at 678 (*citing Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006)). In other words, the Court will not overturn an ALJ's credibility determination unless it is patently wrong. *Id.* To be patently wrong, an ALJ's determination must lack "any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008). The ALJ's credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96–7p, 1996 WL 374186, at *2. It is well settled that an ALJ "may not reject a claimant's subjective complaints of pain solely because they are not supported by medical evidence." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

21

Once the ALJ determines that a claimant's impairments could reasonably be expected to produce the claimant's symptoms, the ALJ must evaluate "the intensity, persistence, or functionally limiting effects" of the claimant's symptoms. SSR 96–7p, 1996 WL 374186, at *2. When statements about such effects are not substantiated by objective medical evidence, the ALJ must make a credibility determination based on the entire case record. *Id.* In making a credibility determination, the ALJ should consider the following factors in addition to objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of medication the claimant takes to alleviate pain; (5) treatment, other than medication, that the individual has received for relief of pain; (6) any other measures the individual uses to relieve pain; (7) and any other factors concerning the individual's functional limitations. *Id.* at *3.

Here, the ALJ failed to build a logical bridge between the evidence and her credibility determination because she failed to adequately articulate the specific reasons for her finding. The ALJ does not provide any discussion of the claimant's daily activities, medication, or level of pain or other symptoms. She merely concluded that Lopez's complaints were not supported by the treatment notes. The ALJ stated that she did not believe Lopez's testimony that she stopped working due to severe fatigue because Lopez had also stated that she stopped working because the company closed. But this is not enough to discount her complaints because an individual may, for a number of reasons, force herself to work for years despite suffering from various ailments. *See Goble v. Astrue*, 385 F. App'x. 588, 592 (7th Cir. 2010) (noting that a

claimant may force herself to continue working despite serious health issues). According to Lopez's testimony, she began having difficulty at work several years before the factory closed, and her health problems forced her to take frequent breaks, leave work early, or miss several days of work a month. (R. 43, 51-53.) In addition to her testimony, the record contains other references to Lopez's fatigue, including Dr. Goel's reports that she suffered from chronic fatigue, which caused some physical limitations on her ability to work. (R. 314-15, 332-33.) The ALJ should have considered this evidence in her credibility analysis.

We do not opine on whether Lopez's testimony was credible, only that the ALJ's finding lacked sufficient detail as to why she discounted Lopez's testimony about her severe fatigue. Her failure to adequately articulate the reasoning for her credibility finding in light of certain evidence in the record warrants remand.

### 5. Remaining Issue

Because we have already determined that a remand is appropriate, we will not address Lopez's remaining argument that the ALJ erred when she failed to consider all of the testimony of the VE. The reevaluation of Lopez's mental impairment will require the ALJ to revisit the application of the VE's testimony to the other facts in the record.

### IV. Conclusion

For the reasons set forth above, Lopez's motion for summary judgment is granted in part and the Commissioner's motion for summary judgment is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion. It is so ordered.

23

**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: January 10, 2014**